UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| BRIDGE INFORMATION SYSTEMS, INC., | ) | Case No. 01-41593-293 |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| SCOTT P. PELTZ, Plan Administrator, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | Adv. No. 04-4007-293 |
| | ) | |
| MERISEL AMERICAS, INC & MOCA, | ) | |
| | ) | (Publish) |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Scott A. Peltz, the Plan Administrator for the estate of Bridge Information

Systems, Inc. ("Bridge"), brought this adversary proceeding seeking to avoid as

preferential under 11 U.S.C. §547(b), 15 transfers totaling $24,100,522.74 that

Bridge remitted to MOCA. MOCA concedes that the payments were preferential

under §547(b), but nonetheless argues that Plan Administrator may not avoid at

-1-

least some of the transfers for one of two reasons.

First, MOCA contends that Plan Administrator may not avoid all but the last two payments because Bridge made those payments in the ordinary course of business under 11 U.S.C. §547(c)(2). MOCA argues in the alternative that even if Bridge did not make the payments in the ordinary course of business, Plan Administrator may not avoid $11,566,317.41 of the payments in questions under 11 U.S.C. §547(c)(4) because MOCA provided subsequent new value in that amount to BridgeVAR, one of Bridge's operating units, in the form of computer equipment.

For the following reasons, the Court finds that MOCA failed to establish its ordinary course defense under §547(c)(2), but MOCA did prove its subsequent new value defense under §547(c)(4). The Court, therefore, will enter judgment in favor of Plan Administrator in the amount of $12,534,197.33.

## JURISDICTION AND VENUE

This Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§1334, 151, and 157 and Local Rule 9.01 (B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. §157(b)(2)(F), which the Court may hear and determine. Venue is proper in this District under 28 U.S.C. §1409(a).

## FINDINGS OF FACT

Bridge, through its subsidiaries and operating units, was a leading provider of financial information to large financial institutions. BridgeVAR was one of Bridge's operating units.

BridgeVAR was in the business of selling mid-range to high-end computer systems to Bridge's large institutional customers. Such sophisticated computer systems are referred to as Enterprise Systems. BridgeVAR was a value added reseller ("VAR") of Enterprise Systems. The three primary manufacturers of Enterprise Systems, Hewlitt-Packard ("HP"), IBM and Sun Microsystems ("Sun"), all utilize VARs to distribute their products to end users.

HP, IBM and Sun all utilize the same general distribution model. First, the manufacturer sells the Enterprise System directly to one of its master distributors. A VAR will then purchase the Enterprise System from the master distributor, add software and other components to the systems, and then sell the reconfigured system to the end user.

In the Enterprise Systems industry, a VAR may only resell a computer systems if it is licensed by the manufacturer to do so. Additionally, the typical agreement between the manufacturer and the VAR prohibits the VAR from selling

another manufacturer's product without first terminating the original agreement.

As will be pointed out below, however, these agreements generally contain a term

that allows either the manufacturer or the VAR to terminate the agreement without

cause with 90 days notice.

BridgeVAR's predecessor, EJV Partners, entered into an agreement with

Sun that allowed EJV to purchase Enterprise Systems directly from Sun and then

resell the product to end users. Sun, however, advised EJV in 1995 that EJV

would have to purchase its product through Sun's distribution channel. Sun,

therefore, required EJV to purchase its Sun Enterprise Systems from one of Sun's

master distributors, Meriesel Americas or Arrow Electronics.

EJV selected to purchase its Sun products from Meriesel and entered into an

agreement with Meriesel in January 1995 (the "Agreement"). Under the terms of

the Agreement, EJV had the right to purchase Sun manufactured Enterprise

Systems from one of Meriesel's divisions, MOCA. Additionally, the Agreement

provided that EJV would have an open credit line of $10,000,000.00. The

Agreement remained in effect without substantial modification until Bridge filed

its petition for relief on February 15, 2001.

Bridge purchased EJV in May 1997 and integrated EJV's VAR business by

creating BridgeVAR. BridgeVAR had approximately 15 employees who worked

out of Bridge's office in the World Trade Center.  Additionally, because

BridgeVAR was simply an operating unit of Bridge, BridgeVAR's director, Paul

Frankel, was not a member of Bridge's management team and was not privy to

discussions relating to key strategic decisions of the firm.

At all times relevant to this dispute, BridgeVAR generated and remit a

purchase order to MOCA upon receiving an order from one if its end-user

customers.  MOCA would then ship the product to BridgeVAR, who would then

configure the Sun product for the particular needs of the end user.  MOCA would

also generate an invoice and ship that invoice along with the Sun product to

BridgeVAR.  BridgeVAR, after receiving the invoice from MOCA, would submit

a check requisition to Bridge's corporate office in St. Louis for payment to MOCA.

BridgeVAR had no control over how fast Bridge's office in St. Louis remitted

payment to MOCA.  Also, if BridgeVAR returned a product to MOCA, MOCA

would issue a credit memo, crediting BridgeVAR's account in an amount equal to

the invoice price of the returned product.

Meriesel began looking for a buyer for MOCA in mid-2000.  MOCA

enlisted the help of an investment banker to shop MOCA to potential bidders.  The

investment banker presented MOCA to several large computer distribution

companies that had operating divisions or subsidiaries that were master distributors

of IBM and HP.  The investment banker conducted an auction for MOCA in October 2000 and Arrow Electronics, a large broad-line distributor of computer systems and products, was the winning bidder.

Arrow closed on its purchase of MOCA on October 17, 2000.  At that point, MOCA became an operating unit within Arrow's North American Computer Products ("NACP") division.  Arrow had other operating units within its NACP division that were master distributors of both HP and IBM.  Specifically, Support Net was Arrow's operating unit that was a IBM master distributor and SBM was a HP master distributor.

The various agreements between the parties in Sun's distribution channel were terminable, without cause, with 90 days notice.  This term was also common in the IBM and HP distribution channels.  Thus, as Frankel observed at trial, master distributors and VARs within one manufacturer's distribution channel could somewhat easily change to another manufacturer's distribution channel.

The ability of VARs to switch distribution channels is evidenced by the fact that Arrow desired to have a Sun, IBM and HP master distributor within its NACP division.  The evidence adduced at trial established that one of Arrow's primary motives in acquiring MOCA was to ensure that Arrow's VAR customers had complete flexibility within the Arrow NACP division to purchase IBM, HP or Sun

Enterprise Systems. In fact, many of Arrow's VAR customers did purchase products from all three of the operating units within Arrow's NACP division. Accordingly, MOCA faced competition for VAR customers not only from other Sun master distributors, but also from the master distributors within the IBM and HP distribution channels.

Also, although the design and architecture of each manufacturer's Enterprise System differed, the IBM and HP systems had the same basic functionality as the Sun system and all three utilized the same basic operating systems, Unix and Linux. Many end-users of Enterprise Systems, therefore, over time purchased systems manufactured by HP, IBM and Sun. Thus, BridgeVAR's competitors included not only other Sun VARs, but also the VARs of IBM and HP.

Sun had two other master distributors during 2000 and early 2001, GE Access and Ingram Micro. Additionally, there were a number of master distributors in the IBM and HP distribution channels during this time frame.

At trial, MOCA produced the testimony of Peter Frankovsky, who was GE Access's director of financial planning during the 2000 to 2001 time frame. Frankovsky testified that while at GE Access, he benchmarked GE Access's financial performance against master distributors in the Enterprise Systems market, including those distributors in the IBM and HP distribution channels. Frankovsky

-7-

remarked that he benchmarked GE Access's financial performance against these companies because they were in "close proximity" to GE Access's business.

MOCA also adduced the testimony of Dorothy Sullivan, its credit manager, at trial. Sullivan testified that a significant number of MOCA's larger customers, which she defined as annual purchases in excess of $3,000,000.00, had payment terms of either 45 or 60 days net of invoice. Sullivan also stated that she became familiar with the payment terms that GE Access and Avnet, an IBM master distributor, offered their VAR customers while attending meetings held by the National Association of Credit Managers ("NACM"). Sullivan stated that GE Access had payment terms raging from pre-pay to 90 days net of invoice and that Avnet's terms ranged from 30 to 60 days.

Sullivan, however, on cross-examination could not identify the particular persons at either GE Access or Avnet that gave her this information. Sullivan additionally could not state with certainty on cross-examination whether the information relating to payment terms offered by GE Access or Avnet covered the 2000 and 2001 time frame. Further, Sullivan could not testify as to the DSO for either GE Access or Avnet during the relevant time frame, which would reflect how quickly those companies' customers were actually paying the invoices. The Court, therefore, does not find her testimony credible as it relates to the credit

terms offered by either GE Access or Avnet

At the time Arrow acquired MOCA in October 2002, Arrow's leader of its NACP division, Kathleen Norris, notified its CFO, Paul Reilly, that three of MOCA's VAR customers needed some attention due to MOCA's accounts receivables exposure to those customers. One of the customers that Norris identified was BridgeVAR.

BridgeVAR's total outstanding accounts receivable balance to MOCA in October 2000 was approximately $15,500,000.00, which was more than $3,000,000.00 over its credit limit. Additionally, $2,500,000.00 of the receivables due from BridgeVAR were past due under the terms of the Agreement.

Arrow's concern over Bridge's financial position was well founded. Bridge's CFO, Steve Wilson, warned of a significant looming liquidity crisis in the early part of 2000. Wilson ordered that, because of Bridge's liquidity issues, the operating units would need to stretch payables to their vendors.

Bridge's liquidity position temporarily improved in June of 2000 with the sale of assets and additional debt instruments. Bridge, however, quickly burned through this infusion of cash. Bridge's Execute Team, in an e-mail dated August 30, 2000, remarked that the cash infusion from the sales in June would last only approximately 90 days and that the operating units would once again need to

stretch their payables to their vendors beginning in October 2000.

Bridge's liquidity position continued to deteriorate to a point where it could no longer service its crushing debt load and pay its vendors. Accordingly, one of Bridge's primary creditors, Highland Capital, filed an involuntary petition against Bridge on February 2, 2001. Bridge then filed a voluntary petition for relief under Chapter 11 of the Code on February 15, 2001, which rendered the involuntary petition moot. Thus, the 90 day preference period began on November 15, 2000. During the preference period, Bridge remitted 13 checks and 2 wires transfers to MOCA totaling $24,100,522.74 (the "Transfers"). Bridge remitted the Transfers to MOCA in payment of 517 invoices.

The head of MOCA, Richard Severa, met with Frankel on February 7, 2001, which was in the interim between Highland's involuntary petition and Bridge's voluntary petition. Both Severa and Frankel testified that they did not discuss Highland's involuntary petition at this meeting. In fact, both stated that they were not even aware of Highland Capital's involuntary petition at the time. They also both remarked at trial that the terms of the Agreement, including the payment term of net 60 days, were not discussed at the meeting and that those terms remained the same until Bridge filed the voluntary petition.

Bridge, however, remitted two payments to MOCA by wire transfer after the

-10-

February 7 meeting.  Specifically, Bridge remitted a payment by wire transfer to

MOCA of $208,093.81 on February 12, 2001, and then another payment of

$84,098.27 the following day (collectively the "Wire Transfers").

These were the last two payments made by Bridge to MOCA before Bridge

filed its voluntary petition.  Additionally, the six invoices generated by MOCA that

Bridge paid by the Wire Transfers reflected that MOCA had changed Bridge's

account from an open account with a payment term of net 60 days to a "pre-pay"

account.

Bridge's payments to MOCA had always been by check from the date the

original parties executed the Agreement in 1995 until it made the two Wire

Transfers.  Frankel conceded on cross-examination that Bridge would not have

made a payment to a vendor by wire transfer unless he directed the corporate office

in St. Louis to do so.  Frankel further admitted that he would not have requested a

payment by wire transfer unless the vendor threatened to stop shipping product.

Frankel, however, continued to maintain that there were no changes in

BridgeVAR's credit terms with MOCA, and that he had no explanation as to why

Bridge made the Wire Transfers.

Sullivan and Severa also testified at trial that MOCA never altered Bridge

VAR's payment terms and the term was always payment within 60 days of invoice.

-11-

Sullivan remarked that had MOCA altered the payment terms with BridgeVAR, she would have been aware of the modification because she would have changed the terms in MOCA's computer system. Sullivan, however, could not explain why the last six invoices that MOCA generated with respect to the Wire Transfers reflected a payment term of "pre-pay".

MOCA produced the testimony of Dr. Julie Rainbolt, a statistician, at trial. Dr. Rainbolt examined whether Bridge's payments to MOCA during the preference period were statistically similar to the payments during the one year period before the preference period. Dr. Rainbolt found that Bridge remitted payment to MOCA on average 64 days after invoice during the preference period as compared to 63 days during the pre-preference period.

Dr. Rainbolt also examined the standard deviation of the number of days Bridge paid MOCA after the invoice date for the pre-preference and preference periods. Dr. Rainbolt concluded that the standard deviation was 10 days in the pre-preference period versus 8 days in the preference period. This result suggests that Bridge's payments to MOCA during the preference period were marginally less variable around the mean as compared to the pre-preference period.

Dr. Rainbolt further examined the average days sales outstanding ("DSO") for each check Bridge issued to MOCA during both the pre-preference and

-12-

preference periods.  This analysis demonstrated that both periods, Bridge paid

several invoices with one check.  Further, the DSO testing revealed that in both

period, the majority of checks paid invoices with an average DSO in the 60-67

days range.

Dr. Rainbolt's DSO findings suggest that Bridge batched invoices for

payment of roughly the same age in the preference period as in the pre-preference

period.  Dr. Rainbolt's report also demonstrates that Bridge remitted payment to

MOCA with the same frequency during the two periods, approximately every 7

days.

Although the timing and frequency of Bridge's payments to MOCA were

similar in both periods, Bridge batched fewer invoices per payment in the

preference period.  Dr. Rainbolt's analysis demonstrated that during the preference

period, 52% of Bridge's payments batched fewer than 40 invoices compared to

only 19% in the pre-preference period.  Additionally, Bridge did not batch more

than 80 invoices in any payment during the preference period but batched more

than 80 invoices with almost a third of its payments to MOCA during the pre-

preference period.

Frankel explained that because BridgeVAR was placing fewer orders with

MOCA in late 2000 and early 2001, MOCA was generating fewer invoices to

BridgeVAR during that time frame.  Frankel contended at trial this dynamic was the reason Bridge was paying fewer invoices with each payment during the preference period.  Frankel asserted that BridgeVAR's reduction in its orders to MOCA was simply part of the overall decline in BridgeVAR's business during the last half of 2000 and early 2001.

Regardless of the reason for the decline in the number of invoices MOCA generated to BridgeVAR, however, Bridge's payment to MOCA at the same frequency and amount during the preference period resulted in a dramatic decrease in MOCA's accounts receivable exposure to BridgeVAR during the preference period.  Specifically, BridgeVAR made nearly $24,100,000.00 in payments to MOCA during the preference period but MOCA shipped only approximately $12,200,000.00 in product to BridgeVAR.  Thus, MOCA's account receivable exposure with BridgeVAR declined by nearly $12,000,000.00 during the preference period.  The Court notes that MOCA's reduction in its accounts receivables exposure to BridgeVAR coincides with Arrow's identification of BridgeVAR as one of the three MOCA customers whose accounts receivables position warranted some attention.

As just illustrated, MOCA did continue to ship computer products to BridgeVAR during the preference period.  In fact, MOCA shipped $12,210,868.00

worth of product to BridgeVAR after MOCA received the first of the Transfers on

November 20, 2000 but before receiving the last Wire Transfer on February 13,

2001.  Bridge, as of the petition date, had paid MOCA for approximately

$4,243,000.00 worth of the invoices generated with respect to these shipments.

These payments from Bridge to MOCA comprise a portion of the Transfers that

Plan Administrator seeks to avoid.  MOCA additionally issued approximately

$1,900,000.00 worth of credit memos to BridgeVAR during the preference period

for goods that BridgeVAR returned.  Only $922,000.00 of these credit memos,

however, represent computer products that MOCA shipped to BridgeVAR during

the preference period.

Plan Administrator brought this adversary complaint on January 9, 2004,

seeking to avoid the Transfers as preferential under 11 U.S.C. §547(b) and to

recover the value of the Transfers from MOCA under 11 U.S.C. §550(a)(1).

MOCA filed an answer to the adversary complaint and asserted two affirmative

defenses.  First, MOCA argues that Plan Administrator cannot avoid the Transfers

because they were made in the ordinary course of business as provided in 11

U.S.C. §547(c)(2).  MOCA additionally contends that Plan Administrator cannot

avoid the Transfers to the extent that MOCA provided new value to BridgeVAR

subsequent to receiving the Transfers.

The Court conducted a trial in April 2007.  The Court then established a
schedule allowing the parties to submit post-trial briefs.  The parties completed
their post-trial briefing on October 22, 2007.

MOCA conceded before trial that the Transfers were preferential under 11
U.S.C. §547(b).  MOCA additionally admitted prior to trial that Bridge did not
remit the Wire Transfers to it in the ordinary course of business as provided in 11
U.S.C. §547(c)(2).

## CONCLUSIONS OF LAW

*A.  Introduction*

As stated above, MOCA has stipulated that the Transfers were in fact
preferential under §547(b).  Also, there is no question that MOCA was the initial
recipient of the Transfers.  Thus, unless MOCA can establish that one of the
affirmative defenses contained in §547(c) applies, Plan Administrator may recover
the value of Transfers from MOCA under §550(a)(1).

MOCA contends that two of the affirmative defenses listed in §547(c)
applies.  First, MOCA maintains that all of the Transfers, apart from the two Wire
Transfers, were made in the ordinary course of business under §547(c)(2).  MOCA
argues in the alternative that if Bridge did not remit the Transfers in the ordinary
course, MOCA advanced $11,566,325.11 of subsequent new value, net of certain

-16-

of the credit memos, to BridgeVAR after MOCA received the Transfers under

§547(c)(4). Thus, MOCA maintains that if it does not prevail on its ordinary

course defense, Plan Administrator may not avoid $11,566,317.51 worth of the

Transfers under §547(c)(4).

MOCA bears the burden of establishing each of its affirmative defenses by a

preponderance of the evidence. 11 U.S.C. §547(g); *Shodeen v. Airline Software,*

*Inc. (In re Accessair, Inc.),* 314 B.R. 386, 392 (B.A.P. 8th Cir. 2004). The Court

finds that MOCA failed to establish its ordinary course of business under

§547(c)(2). MOCA, however, did establish that it remitted $11,566,317.41 in

subsequent new value to BridgeVAR under §547(c)(4). Thus, the Court finds that

Plan Administrator is entitled to recover $12,534,197.33 from MOCA.

*B. MOCA failed to establish by a preponderance of the evidence that Bridge*
*remitted the Transfers in the ordinary course of business pursuant to §547(c)(2).*

*1. Elements of the Ordinary Course Defense*

The version of Section 547(c)(2) of the Code in effect at the time Bridge

filed its petition in 2001 provided that a trustee could not avoid a preferential

transfer:

> (2) to the extent that such transfer was--
>     (A) in payment of a debt incurred by the debtor in the ordinary course
>     of business or financial affairs of the debtor and the transferee; and
>     (B) made in the ordinary course of business or financial affairs of the
>     debtor and the transferee; and

(c) made according to ordinary business terms.

Because the relevant version of §547(c)(2) is written in the conjunctive, MOCA must establish all three of the statutory elements of its ordinary course defense by a preponderance of the evidence.[1] *Concast Canada, Inc. v. Laclede Steel Co. (In re Laclede Steel Co.)*, 271 B.R. 127, 130 (B.A.P. 8th Cir. 2002).

Here, although Plan Administrator does not concede that MOCA has met its burden of proof under §547(c)(2)(A), there is no question that BridgeVAR remitted the Transfers to MOCA in the ordinary course of the business affairs of both parties.  The evidence adduced at trial unequivocally established that BridgeVAR was in the business of buying Enterprise Systems and then reselling those systems to end users.  Also, MOCA, as a Sun Master Distributor, was in the business of selling Sun Enterprise Systems to VARs.  Accordingly, the Court finds that MOCA established that the Transfers were in payment of debts incurred in the ordinary course of business of both MOCA and BridgeVAR.

The two real issues in dispute on MOCA's ordinary course defense are whether MOCA produced sufficient evidence to establish that the Transfers were subjectively ordinary as between BridgeVAR and MOCA as required by

---

[1] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended the statute so that the elements are written in the disjunctive.

§547(c)(2)(B) and objectively ordinary with respect to the relevant industry under

§547(c)(2)(C).  The Court finds that MOCA has failed to meet its burden of proof

on both issues.

*2.  MOCA failed to establish that the Transfers were subjectively ordinary as between Bridge and MOCA.*

As the Eighth Circuit has noted, there is no precise test to determine whether

a particular transaction is subjectively ordinary between the debtor and transferee

under §547(c)(2)(B).  *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.

1987).  Rather, the court must employ a "peculiarly factual" analysis to determine

whether the transfers in question are subjectively ordinary.  *Id*.  The central focus

of the fact intensive analysis under §547(c)(2)(B) is to ensure that neither the

creditor nor debtor engaged in unusual activity during the debtor's slide into

bankruptcy to benefit the transferee creditor.  *Central Hardware Co., Inc. v.*

*Sherwin-Williams Co. (In re Spirit Hardware Co.)*, 153 F.3d 902, 904 (8th Cir.

1998) (*quoting* S.Rep. No. 95-989 at 88 (1978)).

Here, MOCA argues that all of the Transfers, except the two Wire Transfers,

were subjectively ordinary.  MOCA premises its argument on Rainbolt's

conclusion that the payments during the preference period were statistical similar

to the payments in the pre-preference period in timing, amount, and frequency.

The Court disagrees with MOCA's position.

-19-

It is true that a debtor's consistent payment history to the creditor in question is an important factor in determining whether a payment is subjectively ordinary under §547(c)(2)(B). *See Lovett*, 931 F.2d at 499. But as noted above, the policy objective underlying the ordinary course defense is to discourage unusual activity of either the debtor or creditor during the preference period. Therefore, evidence that either party undertook some unusual activity to benefit the preferred creditor during the preference period will take the payments outside of the ordinary course of business. *Central Hardware*, 153 F.3d at 905. This is true even if the timing of the payments during the preference period was statistically consistent with the timing during the pre-preference period. *Frank v. Volvo Penta of the Am. (In re Thompson Boat Co.)*, 199 B.R. 908, 913-14 (Bankr. E.D. Mich. 1996).

Here, the Court agrees with MOCA that Rainbolt's testimony established a statistical similarity between Bridge's payment to MOCA in the preference and pre-preference periods. But the Court finds that given the unique facts surrounding the business relationship between MOCA and BridgeVAR, there is a substantial likelihood that the parties undertook some action to substantially reduce MOCA's account receivable exposure to BridgeVAR just prior to and during the preference period.

MOCA argued at trial that the parties never altered the payment terms of the

-20-

Agreement and that MOCA's reduced accounts receivable exposure to BridgeVAR during the preference period was simply a coincidence.  MOCA proffered the testimony of Frankel and Sullivan to support this claim.

Frankel testified that the reduction in BridgeVAR's orders to MOCA was the result of a general decline in BridgeVAR's business and that the parties did not alter the terms of the Agreement .  Sullivan also testified that there was no change in the payment terms between BridgeVAR and MOCA.  Neither Frankel nor Sullivan, however, were able to explain on cross-examination why Bridge began to pay by wire transfer at the end of the preference period or why the invoices generated by MOCA reflect a term of "pre-pay".

Frankel testified that Bridge would only pay by wire transfer if he authorized such a payment and that he would only request a wire transfer if the vendor threatened to stop shipping product.  Frankel maintained that he did not authorize a payment by wire transfer to MOCA, and he could not explain why in fact Bridge's office in St. Louis made those payments.  Sullivan similarly testified that only she could change the payment terms in MOCA's computer system, but she had no explanation why the terms with BridgeVAR had changed to pre-pay on  MOCA's invoices.  While it may be true that Frankel and Sullivan subjectively believed that the parties did not alter the terms of the Agreement, it is clear from the evidence

-21-

that those terms were in fact altered.

The Wire Transfers and the corresponding invoices that reflect a term of pre-pay are the only examples in the parties' long relationship where Bridge did not pay by check after BridgeVAR received an invoice from MOCA. Additionally, both MOCA and BridgeVAR were simply operating units of Arrow and Bridge respectively, so neither Frankel nor Sullivan were privy to top level management discussion and decisions. Further, just prior to the preference period, the Vice President of Arrow's NACP division, which included MOCA, noted that BridgeVAR's accounts receivable position was a potential problem and needed additional attention.

Given this evidentiary record, despite both Frankel and Sullivan's testimony, there is no doubt that at some point the parties altered the payment terms of the Agreement so that BridgeVAR was a "pre-pay" customer.[2] It is also clear from the evidence adduced at trial that Bridge would have acquiesced to this change only if MOCA, or someone at Arrow, threatened to stop shipping product to BridgeVAR.

---

[2] The Court notes that MOCA argues that the Wire Transfers are irrelevant to the analysis because it concedes that those payments were not made in the ordinary course of business. But the key issue here is that Bridge remitted the Wire Transfers to MOCA because the parties altered the payment terms of the Agreement during the preference period, which is an issue that MOCA vigorously denies.

Additionally, because MOCA failed to offer any evidence at trial as to when or how this change occurred, it is unclear as to when the parties actually altered the terms of the Agreement or what discussions between Arrow and Bridge precipitated the change. Further, it is uncertain from the record as to whether the parties altered their course of dealing prior to explicitly altering the payment terms, especially given Arrow's identification of BridgeVAR's outstanding receivable balance as an area of concern. The Court, therefore, finds that MOCA failed to establish by a preponderance of the evidence that the Transfers were subjectively ordinary under §547(c)(2)(B).

*3. MOCA failed to establish by a preponderance of the evidence that the Transfers were objectively ordinary under §547(c)(2)(C).*

The statute also requires MOCA to demonstrate that the Transfers were made and received in accordance with the ordinary business terms prevailing in the industry under §547(c)(2)(C). This analysis is purely objective and is separate and discrete from the subjective inquiry under §547(c)(2)(B). *Jones v. United Sav. & Loan Assoc. (In re U.S.A. Inns of Eureka Springs, Inc.)*, 9 F.3d 680, 685 (8th Cir. 1993).

A creditor, in order to meet its burden of proof under §547(c)(2)(C), must establish that the preferential payments in question are objectively ordinary with respect to the prevailing practice among similarly situated members of the relevant

industry.  *Id.*  Also, although §547(c)(2)(C) does not require the creditor to

establish the existence of a uniform set of business terms within the industry, it

does require the creditor to demonstrate that the payments in question fit within the

general range of terms prevailing among similarly situated firms.  *Id.*  The creditor,

therefore, must at a minimum produce evidence as to what is the relevant industry

and the general range of terms prevailing in that industry.  *Peltz v. Gulfcoast*

*Workstation Corp. (In re Bridge Info. Sys.)*, 460 F.3d 1041, 1044-45 (8th Cir.

2006).

      The key question here is what exactly is the industry.  The identification of

an "industry" for purposes of §547(c)(2)(C) is often a very difficult endeavor.  *See*

*In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).  But the

Eighth Circuit, following the Seventh Circuit's decision in *Tolona Pizza*, has held

that objective test of §547(c)(2)( C) requires the creditor to establish the broad

range of term that encompasses the practices of firms similar in some general way

to the creditor.  *Inns of Eureka Springs*, 9 F.3d at 685.

      Here, MOCA argues that the relevant industry consists only of the two

master distributors of Sun Enterprise Systems, itself and GE Access, that were in

existence in 2000 and 2001.  The evidence adduced at trial, however, demonstrates

that the master distributors of Enterprise Systems manufactured by Sun's

competitors, IBM and HP, were substantially similar to both MOCA and GE

Access for the following reasons.

VARs, such as BridgeVAR, had the ability to switch the distribution channel

in which they bought and sold Enterprise Systems.  Additionally, because the

systems manufactured by Sun, IBM and HP were functionally similar, VARs did

switch to satisfy the particular needs of their end user customers.  In fact, the

primary reason Arrow purchased MOCA was to have a master distributor of Sun,

IBM and HP within its NACP division so as to give its VAR customers complete

flexibility to switch distribution channels.  Additionally, Frankovsky testified that

he benchmarked GE Access's financial performance not only against MOCA, but

the master distributors within the IBM and HP distribution channels as well

because those firms were in "close proximity" to GE Access.

This evidence establishes that the master distributors of IBM and HP were

similar in some general way to MOCA.  Thus, the relevant "industry" under the

Eighth Circuit's definition of that term as outlined in *Eureka Springs* is not simply

the two master distributors within the Sun Enterprise distribution channel, but the

master distributors of IBM and HP as well.

Here, because MOCA took the position at trial that only it and GE Access

constituted the relevant industry, it only adduced evidence of it and GE Access'

credit practices by producing the testimony of Frankovsky.  Sullivan did testify

that the credit practices of Avnet were generally similar to those of  MOCA.

Sullivan, however, on cross-examination was unable to identify exactly how she

gleaned this information or even whether the information pertained to the relevant

time frame.

Based on this evidence, the Court finds that MOCA failed to offer credible

evidence of the credit terms of master distributors of Enterprise Systems apart from

itself and GE Access.  Thus, the Court finds that MOCA failed to make the

threshold showing of what were the range of terms prevailing within the Enterprise

Systems distribution industry.  Accordingly, MOCA failed to establish that the

Transfers were objectively ordinary under §547(c)(2)(C).

*C.  MOCA may offset $ 11,566,317.51 in subsequent new value it provided to
BridgeVAR.*

Section 547(c)(4) of the Code provides that a trustee may not avoid a

transfer to the extent that after the transfer, the transferee gave new value to the

benefit of the debtor: "(A) that is not secured by an otherwise unavoidable security

interest; and (B) on account of which new value the debtor did not make an

otherwise unavoidable transfer to... the creditor." §547(c)(4).  A creditor, therefore,

in order to meet its burden of proof under §547(c)(4) must demonstrate by a

preponderance of the evidence that: (1) it received a transfer that is otherwise

-26-

avoidable as a preference under §547(b); (2) after receiving the preferential

transfer, it provided new value to the debtor on an unsecured basis; and (3) the

debtor did not compensate it with an "otherwise unavoidable" transfer for the new

value.  *Kroh Bros. Dev. Co. v. Continental Const. Eng'r. (In re Kroh Bros Dev.*

*Co.)*, 930 F.2d 648, 652 (8th Cir. 1991).

Here, MOCA shipped $12,488,597.40 worth of computer products to

BridgeVAR after it received the first preferential transfer on November 20, 2000

and before it received the last Wire Transfer.  Bridge paid MOCA for

approximately $4,200,000.00 of this computer equipment.  The approximately

$24,100,000.00 in payments that Plan Administrator seeks to avoid under §547(b),

however, includes this $4,200,000.00 worth of payments.

MOCA also issued $1,900,000.00 in credit memos to BridgeVAR for

computer products that BridgeVAR returned to MOCA during the preference

period.  These credit memos, however, only include $922,271.49 worth of

computer products that MOCA shipped after the first preferential transfer.  Thus,

only $922,271.49 worth of the credit memos correspond to the computer products

that comprise MOCA's subsequent new value.

Plan Administrator concedes that the $12,488.597.40 worth of computer

products constitutes new value and that MOCA provided this new value to

BridgeVAR on an unsecured basis under §547(c)(4)(A).  He argues, however, that this amount should be reduced by the $4,200,000.00 worth of invoices that Bridge paid to MOCA during the preference period and the full $1,900,000.00 in credit memos that MOCA issued to BridgeVAR during the preference period.

MOCA counters by pointing out that it has conceded that Plan Administrator can avoid the $4,200,000.00 worth of payments as preferential under §547(b) and that it can only utilize its new value defense if it fails on its ordinary course defense.  MOCA contends, therefore, that the $4,200,000.00 in payments are "otherwise avoidable" and should be included in the new value calculation under §547(c)(4)(B).  MOCA additionally argues that Plan Administrator is only entitled to reduce its new value by the $922,271.99 in credit memos that cover the computer products it shipped to BridgeVAR during the preference period and that comprise a portion of the new value.  The Court agrees with MOCA's position.

Concerning the $4,200,000.00 worth of payments, there is no question that when a creditor receives payment for the new value, and the payment is not "otherwise avoidable", the creditor may not avail itself of the subsequent new value defense under §547(c)(2)(B).  *Kroh Bros.*, 930 F.2d at 655.  But here, the $4,200,000.00 worth of payments are otherwise avoidable because they are preferential under §547(b) and MOCA did not prevail on its ordinary course

defense under §547(c)(2).

Plan Administrator argues, nonetheless, that because MOCA did not concede that it could not prevail on its ordinary course defense before trial and immediately disgorge the Transfers to Plan Administrator, MOCA cannot now argue that the $4,200,000.00 in payments are otherwise avoidable under §547(c)(4)(B). The Court disagrees with Plan Administrator's reading of the statute.

Plan Administrator relies exclusively on *Ramette v. Am. Fish & Seafood, Inc. (In re Chez Foley, Inc.)*, 211 B.R. 25 (Bankr. D. Minn. 1997) for its argument that a creditor must concede all of its other affirmative defenses and disgorge the preferential payments before it can avail itself of the subsequent new value defense under §547(c)(4)(B). In *Ramette*, however, the creditor asserted both the ordinary course defense and the subsequent new value defense. *Id*. at 26. Also, like the instant case, the creditor in *Ramette* provided new value to the debtor and the debtor paid for the new value with a preferential transfer. *Id*.

The question that the court addressed in *Ramette* was whether the creditor could utilize the subsequent new value defense even though the debtor paid for the new value with a preferential transfer. *Id*. at 28. The court held that because §547(c)(4)(B) only requires that the debtor did not pay for the new value with an

"otherwise unavoidable transfer", a creditor may utilize the new value defense if the debtor pays for the new value with an avoidable preference and none of the other affirmative defenses set out in §547(c) apply.  *Id.*

The *Ramette* court does recite that the creditor must ultimately "disgorge" to the trustee the preferential payment that paid for the subsequent new value.  *Id.* at 28-29.  But it is clear from the context of the opinion that the court in *Ramette* was simply noting the obvious, the trustee could ultimately recover the value of the preferential transfer, which paid for the new value, under §550(a)(1).  In fact, the creditor in *Ramette* never conceded its ordinary course defense and did not disgorge the preferential payment before filing its motion for summary judgment on its subsequent new value defense. Also, the *Ramette* court pointed out that both the plain language of §547(c)(4)(B) and logic does not permit a trustee to both retain the new value and avoid the preferential transfer that paid for it.[3]  *Id.* at 28.  Thus, the *Ramette* decision actually favors MOCA, not Plan Administrator.

Here, there is no question that all of the Transfers are preferential under §547(b) and that none of the other affirmative defenses contained in §547(c) apply.

_____

[3] Likewise, a creditor may not double dip by both offsetting its preference liability by the new value and retaining the preferential transfer that paid for the new value. *Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.)*, 52 F.3d 228, 233 (9th Cir. 1995).

The Plan Administrator, therefore, can avoid the $4,200,000.00 that Bridge paid to MOCA on the invoices associated with the new value.  Accordingly, the Court finds that the $4,200,000.00 in payments from Bridge to MOCA are "otherwise avoidable" under §547(c)(4)(B) and, therefore, does not reduce the value of MOCA's new value defense.

With respect to the credit memos totaling approximately $1,900,000.00, only $922,271.00 worth of the credit memos are for computer products that MOCA shipped subsequent to receiving the first preferential payment.  Additionally, only the computers that MOCA shipped during the preference period are included in its new value calculation. MOCA concedes that when a debtor returns a product to the creditor that comprises the new value, the parties have essentially underdone the transaction that resulted in the new value to the debtor's estate.  Therefore, the value of any goods that the debtor returns to the creditor that comprises part of the new value must be subtracted from the total amount of new value.  *In re Precision Masters, Inc.*, 51 B.R. 258, 261 (Bankr. S.D. Ind. 1984).  Accordingly, there is no dispute that MOCA's new value must be reduced by the $922,271.00 in returned goods that constitute part of its new value.

Plan Administrator, however, contends that MOCA's new value should be reduced by the value of all the computer products that BridgeVAR returned to

MOCA during the preference period, including the products MOCA delivered before the preference period. The flaw in Plan Administrator's argument is that the amount of MOCA's new value defense does not include the value of those products. The Court fails to see, therefore, the rationale as to why the amount of MOCA's new value should be reduced by the value of returned goods that do not comprise part of MOCA's new value.[4]

In conclusion, MOCA delivered $12,488,597.40 worth of computer products to BridgeVAR subsequent to the first preferential transfers but before the last Wire Transfer. This amount constitutes new value that MOCA provided to BridgeVAR on an unsecured basis. Additionally, Bridge did not compensate MOCA for this new value with an "otherwise unavoidable" transfer under §547(c)(2)(B). Finally, BridgeVAR did return $922,271.49 worth of the new value to MOCA and MOCA may not include this amount in its new value defense. Accordingly, MOCA may utilize $11,566,325.51 worth of subsequent new value under §547(c)(4) to offset against the amount of the Transfers that Plan Administrator may avoid under

---

[4] It is true that these credit memos may be preferential transfers under §547(b) because they are, in essence, a payment on antecedent debt. Plan Administrator, however, does not seek to avoid these credit memos as preferential and that issue is not before the Court. Rather, the question before the Court is whether MOCA's new value should be reduced by the credit memos even though the new value does not include the returned goods.

§547(b).

*D.   Plan Administrator is entitled to recover the value of the Transfers, minus the
subsequent new value, from MOCA under §550(a)(1).*

Section 550(a)(1) provides that a trustee may recover the value of any

avoided transfer §547 from the initial transferee.  Here, the parties stipulated that

the $24,100,522.72 in Transfers were preferential under §547(b).  Also, as

discussed above, MOCA provided $11,566,317.41 worth of subsequent new value

to BridgeVAR under §547(c)(4).  Accordingly, Plan Administrator may avoid

$12,534,197.33 worth of the Transfers.

Also, there is no dispute that MOCA was the initial transferee of the

Transfers.  Plan Administrator, therefore, is entitled to recover $12,534,197.33

from MOCA under §550(a)(1).

*E.  Plan Administrator is not entitled to recover pre-judgment interest from
MOCA.*

Plan Administrator also request that the Court order MOCA to pay pre-

judgment interest on the amount he can recover.  There is no statutory requirement

that directs a bankruptcy court to award pre-judgment interest on a preference

claim.  *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 528 (8th

Cir. 2002).  Additionally, the rule in this Circuit is that a trustee is only entitled to

pre-judgment interest on a preference claim if the transferee creditor had the ability

-33-

to ascertain the amount of its liability on the preference claim without a judicial determination. *Berquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1281 (8th Cir. 1988). Therefore, a trustee is generally not entitled to pre-judgment interest if a good faith dispute exists as to the extent of the creditor's liability. *Armstrong*, 291 F.3d at 528.

Here, as discussed above, MOCA prevailed on its subsequent new value defense. Additionally, although the Court rejected its ordinary course defense, MOCA did present evidence, in the form of Rainbolt's expert testimony, that the timing and amount of the payments in the preference period were consistent with the pre-preference period. The Court finds that on this record MOCA needed judicial determination to determine its liability. Plan Administrator, therefore, is not entitled to pre-judgment interest.

## CONCLUSION

The parties stipulated that the Transfers were preferential under §547(b). MOCA failed to demonstrate both that the Transfers were subjectively and objectively ordinary under §§547(c)(2)(B) and (C) respectively. MOCA did, however, establish that it provided $11,566,317.41 worth of subsequent new value to BridgeVAR under §547(c)(4). Plan Administrator, therefore can avoid $12,534,197.61 worth of the Transfers under §547 and can recover the same

-34-

amount from MOCA under §550(a)(1).

Further, a good faith dispute existed as to the extent of MOCA's liability to Plan Administrator at the time Plan Administrator demanded that MOCA disgorge the entire $24,100,522.74 in October 2002.  Plan Administrator, therefore, is not entitled to prejudgment interest on the $12,534,197.33.  The Court, therefore, will enter judgment in favor of Plan Administrator in the amount of $12,534,197.33.

An Order consistent with this Memorandum Opinion will be entered .

DATED:  March 3, 2008

St. Louis, Missouri
mtc

David P. McDonald
United States Bankruptcy
Judge

St. Louis, Missouri   Copies to:

Cynthia A. Fonner

David Goroff

Foley and Lardner

321 N Clark Street

Suite 2800

Chicago, IL 60610-4714

Gary Lee Vincent

Husch and Eppenberger

190 Carondelet Plz., Ste. 600

St. Louis, MO 63105

Jeffrey M. Galen

Galen and Davis, LLP

16255 Ventura Blvd. Suite 900

Encino, CA 91436